705 A.2d 350

IN THE MATTER OF PATRICIA LYNN HASBROUCK,
AN ATTORNEY AT LAW.

Argued November 17, 1997—Decided January 30, 1998.

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Stephen S. Weinstein,* argued the cause for respondent (*Mr. Weinstein,* attorney; *Gail S. Boertzel,* on the brief).

PER CURIAM.

This attorney-disciplinary matter is based on respondent's criminal convictions in Warren County Superior Court on four counts of third-degree burglary, in violation of *N.J.S.A.* 2C:18–2, three counts of third-degree theft by unlawful taking, in violation of *N.J.S.A.* 2C:20–3, and one count of fourth-degree theft by unlawful taking, in violation of *N.J.S.A.* 2C:20–3. Having pleaded guilty to all eight counts on which she was charged, respondent, Patricia Lynn Hasbrouck, was sentenced to four years of imprisonment and was ordered to pay a $400 Violent Crimes Compensation Board penalty, a $600 Safe and Secure Communities Program fee and $4,178.38 in restitution.

This is not respondent's first disciplinary matter to come before this Court. In May 1995, we suspended respondent for a period of one year for obtaining a controlled dangerous substance by fraud and for uttering a forged prescription. *In re Hasbrouck,* 140 *N.J.* 162, 657 *A.*2d 878 (1995). Respondent has not yet sought to be restored to practice.

On motion of the Office of Attorney Ethics (OAE) for final discipline, the Disciplinary Review Board (DRB) unanimously recommended that respondent be disbarred, rejecting the OAE's recommendation that respondent be suspended for three years. We adopt the recommendation of the DRB.

I

Respondent was admitted to practice law in New Jersey in 1981. Until her suspension in 1995, she was in private practice in Washington Township, Warren County. She served on the Fee Arbitration Committee and was an officer of the Warren County Bar Association. Her ethical record as an attorney was unblemished. Tragically, beginning sometime around 1986, an addiction to prescription pain-killers changed respondent's life. The undisputed facts leading to respondent's initial one-year suspension were set forth in this Court's opinion:

> An unspecified number of years ago, respondent began suffering from migraine headaches. Her father, a physician, prescribed the pain-killing medication, darvocet, for her. Gradually, she started taking the medication more frequently. In 1986, she began taking sheets from her father's prescription pads and forging prescriptions for the drug. At first, respondent had the prescriptions filled only at local pharmacies so the prescription would not be questioned. As she needed to have prescriptions filled more frequently, she traveled greater distances. In 1989, she switched from darvocet to vicodin. When respondent's father retired, his office supplies, including prescription pads, were stored at respondent's home. Respondent wrote prescriptions for herself, not only in her name, but also in the names of her husband and her sister.
>
> On April 12, 1993, respondent was apprehended attempting to have a prescription filled in her sister's name. The pharmacist had called the telephone number on the prescription for verification and learned that respondent's father had been retired for over one year. The pharmacist telephoned the police. Respondent was arrested on that date for violation of *N.J.S.A.* 2C:21–1a(3), uttering a forged prescription, and violation of *N.J.S.A.* 2C:35–13, obtaining a controlled dangerous substance by fraud.
>
> In a statement to the Morris County Prosecutor, respondent admitted the facts underlying the charges. In the criminal proceeding, respondent executed a Waiver of Indictment and was admitted to the [Pre–Trial Intervention] program by order dated August 2, 1993. Respondent entered Clear Brook Manor on April 17, 1993, completed the prescribed twenty-eight day program for substance abuse, and was discharged on May 15, 1993.
>
> In disciplinary proceedings, respondent admitted that she had violated [*Rules of Professional Conduct (RPC)* ] 8.4(b) and (d).
>
> [*In re Hasbrouck, supra,* 140 *N.J.* at 165–66, 657 *A.*2d 878.]

Respondent averred in that disciplinary proceeding that she had overcome her addiction to pain-killing medications, and sought to introduce her rehabilitation as a mitigating factor before both the DRB and this Court. *Id.* at 169–70, 657 *A.*2d 878. Finding that

respondent had "given us no indication that she would have attempted to control her addiction to painkillers if one of her forged prescriptions had not been detected," the Court declined to give significant weight to her efforts to achieve rehabilitation, noting that "[i]t was the heavy arm of the law, rather than her own conscience, that convinced respondent to seek help." *Id.* at 170, 657 *A*.2d 878.

The facts giving rise to this subsequent disciplinary action arose during the very period when respondent's initial disciplinary action was pending before this Court. Her misconduct is described in the Offense Information Report, an excerpt from which is quoted in the DRB opinion:

> Between 11/94 and 02/95, Patricia Hasbrouck burglarized the homes of doctors in four (4) different counties (Warren, Hunterdon, Somerset and Morris). She was attempting to obtain keys to the doctors' offices in order to obtain prescription drugs. After she obtained the keys, she would go to the doctors' offices and take the samples of prescription drugs.

> Ms. Hasbrouck would also take jewelry and the purses of the doctors' wives from the homes. The purses contained cash, credit cards and address books. These address books would have other doctors' names and addresses in them. Ms. Hasbrouck would also obtain the addresses of doctors from the tax maps as well as the IRS tax returns.

> Police Reports indicate that the burglaries and thefts were sometimes in isolated areas. The victims were sometimes home and sleeping when she entered the homes. She used gloves so [as] not to leave fingerprints. She would also call the victims to see if anyone was home.

After her arrest, respondent consented to her temporary suspension on March 16, 1995, approximately two months before this Court issued its decision ordering her one-year suspension on the initial disciplinary charges.

## II

A criminal conviction of an attorney is conclusive evidence of guilt in a disciplinary proceeding. *R.* 1:20–13(c)(1); *In re Howard,* 143 *N.J.* 526, 529, 673 *A*.2d 800 (1996); *In re Kinnear,* 105 *N.J.* 391, 393, 522 *A*.2d 414 (1987). Once an attorney is convicted of a crime, the sole issue to be considered is the extent of discipline to be imposed. *R.* 1:20–13(c)(2); *In re Zauber,* 122

*N.J.* 87, 92, 583 *A.*2d 1140 (1991); *Kinnear, supra,* 105 *N.J.* at 393, 522 *A.*2d 414; *In re Goldberg,* 105 *N.J.* 278, 280, 520 *A.*2d 1147 (1987). In assessing the measure of discipline to be imposed, the background facts and circumstances of the case drawn from presentence reports, plea agreements, and other reliable documentation are also to be considered. *In re Spina,* 121 *N.J.* 378, 389–90, 580 *A.*2d 262 (1990).

■ The principle goal of disciplinary proceedings is to foster and preserve public confidence in the bar, not to punish wrongdoing attorneys. *Howard, supra,* 143 *N.J.* at 529–30, 673 *A.*2d 800; *Kinnear, supra,* 105 *N.J.* at 397, 522 *A.*2d 414; *In re Wilson,* 81 *N.J.* 451, 456, 409 *A.*2d 1153 (1979). As noted by the DRB, even a minor violation of the law by an attorney tends to lessen public confidence in the legal profession as a whole. *In re Addonizio,* 95 *N.J.* 121, 124, 469 *A.*2d 492 (1984). The commission of a criminal act by an attorney also constitutes a violation of that attorney's duty to uphold and honor the law. *In re Bricker,* 90 *N.J.* 6, 11, 446 *A.*2d 1195 (1982). Pursuant to *RPC* 8.4(b), it is professional misconduct for an attorney to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

■ Determining the appropriate discipline for criminal misconduct by an attorney requires a consideration of many factors, including "the nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating factors such as respondent's reputation, his [or her] prior trustworthy conduct, and general good conduct." *In re Lunetta,* 118 *N.J.* 443, 445–46, 572 *A.*2d 586 (1989). That respondent's conduct did not involve the practice of law, was not committed in her professional capacity, and allegedly has harmed none of respondent's clients, does not preclude strong discipline. *Hasbrouck, supra,* 140 *N.J.* at 167, 657 *A.*2d 878; *In re Schaffer,* 140 *N.J.* 148, 156, 657 *A.*2d 871 (1995); *In re Suchanoff,* 93 *N.J.* 226, 230, 460 *A.*2d 642 (1983). Some criminal conduct is so utterly incompatible with the standard of honesty and integrity that we require of attorneys that the most

severe discipline is justified by the seriousness of the offense alone.

In *In re "X"*, 120 *N.J.* 459, 577 *A.*2d 139 (1990), we disbarred an attorney based on his convictions on three counts of second-degree sexual assault against his minor daughters. The Court in *"X"* agreed with the finding of the DRB that "respondent's atrocious acts justify his disbarment. * * * A less severe discipline would undermine the gravity of the ethics offenses, the seriousness of the crimes, and the confidence reposed by the public on the members of the legal profession and on the judicial system." *Id.* at 464, 577 *A.*2d 139. Citing *In re McAlesher*, 93 *N.J.* 486, 461 *A.*2d 1122 (1983), a case in which we disbarred an attorney who pled guilty to second-degree murder, the Court indicated that it was "break[ing] no new ground in disbarring an attorney based on a conviction for a second-degree offense unrelated to the practice of law." *"X"*, *supra*, 120 *N.J.* at 464, 577 *A.*2d 139. In *In re Goldberg*, *supra*, 105 *N.J.* 278, 520 *A.*2d 1147, we disbarred an attorney convicted of a federal felony for conspiracy to distribute a Schedule II controlled dangerous substance. We noted that "the object of the conspiracy constituted a direct threat to society," and that "[t]he crime quite obviously involved dishonesty, deceit and a contempt for the law." *Id.* at 283, 520 *A.*2d 1147. Finding that the "[r]espondent's conduct demonstrat[ed] his lack of fitness to be a lawyer and his unsuitability to be entrusted with the privileges and duties of the legal profession," we held that "[d]isbarment, the strongest sanction available, must be imposed in order to preserve the integrity of the bar." *Ibid.* We have also disbarred an attorney on the basis of federal district court convictions on mail fraud and conspiracy to defraud the United States. *In re Goldberg*, 142 *N.J.* 557, 666 *A.*2d 529 (1995). We noted in *Goldberg* that "[c]riminal convictions for conspiracy to commit a variety of crimes, such as bribery and official misconduct, as well as an assortment of crimes related to theft by deception and fraud, ordinarily result in disbarment." *Id.* at 567, 666 *A.*2d 529.

Here, the nature and severity of respondent's crimes, burglarizing residential homes, sometimes while persons were asleep in their home, weighs heavily against respondent. Although respondent was not charged with second-degree burglary, presumably because there was no evidence suggesting that respondent was armed with a deadly weapon when she committed the crimes, the third-degree burglary of an occupied residential home is an egregious criminal offense that reflects a total disregard for the privacy and sanctity of residential property. In *State v. Baynes*, 148 *N.J.* 434, 446, 690 *A.*2d 594 (1997), this Court explained that "burglary of a home is similar to robbery, in the sense that it raises the public's concern regarding the threat of personal safety...." In *State v. Kraft*, 265 *N.J.Super.* 106, 116, 625 *A.*2d 579 (App.Div.1993), in which the defendant was charged with third-degree burglary of a residence within an apartment complex when nobody was home, the court stressed the severity and violent potential of house burglaries: "It cannot reasonably be disputed that the burglary of a residence is a serious offense. Nor can it be earnestly debated that such an offense accounts for a legitimate source of fear and anxiety on the part of homeowners." The court noted that, although no one was home in the apartment that the defendant burglarized, the nature of the apartment complex was such that a neighbor would be likely to see or hear the crime. *Id.* at 117, 625 *A.*2d 579. The court found that "[u]nder such circumstances, there clearly existed a significant potential for violence, which could easily have been realized if one of the victim's neighbors had interrupted the perpetrators in the middle of their crime." *Ibid.* The potential for violence or unanticipated harm is even more significant where, as here, the residents of the home being burglarized are present.

Furthermore, respondent's prior arrest and discipline for obtaining a controlled dangerous substance by fraud and uttering a forged prescription are serious additional aggravating factors in this matter. Those transgressions were especially grave because of their fraudulent or deceptive nature. *Hasbrouck, supra,* 140 *N.J.* at 167–68, 657 *A.*2d 878; *Zauber, supra,* 122 *N.J.* at 93, 583

*A.*2d 1140. Respondent's misrepresentation before this Court in her earlier disciplinary proceeding that she had overcome her addiction and was fully rehabilitated, when she was in fact at that very time engaged in a course of burglaries and thefts to support her continuing addiction, is an added aggravating factor weighing against respondent. Also, respondent's attempts to support her addiction to pain-killing drugs can fairly be characterized as part of a continuing pattern of illegal conduct that demands stronger discipline than would an isolated criminal incident. *See Zauber, supra,* 122 *N.J.* at 94, 583 *A.*2d 1140.

### III

■ Respondent once again asks this Court to consider her drug addiction in mitigation of the discipline to be imposed. However, this Court has been cautious in assigning mitigating weight to the fact that an attorney's misconduct may have been influenced by an addiction to drugs. *See, e.g. Hasbrouck, supra,* 140 *N.J.* at 169–70, 657 *A.*2d 878; *Zauber, supra,* 122 *N.J.* at 94, 583 *A.*2d 1140; *In re Steinhoff,* 114 *N.J.* 268, 553 *A.*2d 1349 (1989). In cases in which addiction to drugs or alcohol has led to the misappropriation of client funds, addiction invariably has not been considered to be a mitigating factor overcoming the presumption of disbarment. *See In re Ryle,* 105 *N.J.* 10, 12–13, 518 *A.*2d 1103 (1987); *In re Hein,* 104 *N.J.* 297, 303–04, 516 *A.*2d 1105 (1986); *In re Romano,* 104 *N.J.* 306, 516 *A.*2d 1109 (1986). We find that on this record respondent's drug addiction should not be considered as mitigation in view of the grievous misconduct committed by respondent to support that addiction, including burglaries committed by respondent shortly after the argument of respondent's initial disciplinary proceeding before this Court. *See Hasbrouck, supra,* 140 *N.J.* at 170, 657 *A.*2d 878.

Respondent additionally has certified to this Court that she has been drug and alcohol free since February 18, 1995. From February until August of 1997, subsequent to her release from prison, she underwent outpatient treatment for her addiction.

Respondent remains active in Alcoholics Anonymous, attending six meetings per week, and has frequent contact with a local sponsor. However, as before, respondent sought to achieve rehabilitation only after being apprehended in the commission of criminal acts designed to fuel her addiction. *Ibid.*

■ We again recognize that attorneys are not insulated from the expansive reach of the disease of addiction. See *Kinnear, supra,* 105 *N.J.* at 394, 522 *A.*2d 414. This Court appreciates the difficulty of treatment and recovery from addiction and seeks to assist attorneys who attempt to traverse that difficult path in order to better their lives and ease the pain that their addictions cause their families and friends. In some circumstances "an addicted attorney's rehabilitation, even though initiated only after apprehension for criminal violations, may be taken into account as a basis for accelerating discipline, although it will not obviate discipline." *Hasbrouck, supra,* 140 *N.J.* at 171, 657 *A.*2d 878. However, such mitigation of discipline is primarily reserved "for addicted attorneys guilty of offenses involving basically their own personal use of controlled dangerous substances, who genuinely and immediately seek to enroll in a rehabilitation program in order to recover." *Ibid.* As recognized by the DRB, respondent's pattern of fraud and deception, and the severity of her crimes— violating the safety and sanctity of the homes of strangers, sometimes as they slept—does not permit us to impose any discipline but disbarment.

Respondent additionally is to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For disbarment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that **PATRICIA LYNN HASBROUCK** of **WASHINGTON**, who was admitted to the bar of this State in 1981, be disbarred and that her name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **PATRICIA LYNN HASBROUCK** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that **PATRICIA LYNN HASBROUCK** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that **PATRICIA LYNN HASBROUCK** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.